Rehab Synergies, I'd like to reserve five minutes of my time for rebuttal. The FLSA allows an overtime claim to be brought against an employer on behalf of an individual and any others who are, quote unquote, similarly situated. But the FLSA doesn't give any guidance as to what similarly situated means, nor does it give the district courts any guidance on how they are supposed to interpret that or determine whether these claims can proceed collectively. So a couple of years ago, this court filled the gap and clarified what similarly situated means in the Swales case. And under Swales, you have essentially two requirements to prove that a potential collective is, in fact, similarly situated. First, the district courts need to determine what the central legal considerations and factual considerations are in determining the merits of the claims of these putative plaintiffs. So that's number one. Number two is the district court then needs to determine whether that central merits question could be answered collectively. And if not, then they're not similarly situated. And in this case, it's our contention that the district court erred at both of those questions. The legal consideration here is whether the plaintiffs worked off the clock, overtime hours, that the employer either had actual or constructive knowledge of. And that comes straight from the statute. The plain language of the statute says that in order to bring this claim, it has to be work that was suffered or permitted is the statutory language. And this court, since then, in cases like Newton and von Friewald, has said that that means that the employer must have either constructive or actual knowledge. And so that should have been the first step in the district court's analysis. And saying that the merits question here is, did these plaintiffs, are they going to be able to show that rehab synergies had either actual or constructive knowledge? And the district court didn't do that. What the district court did was say that there is a common policy here of these productivity goals is what we say, requirements is what the other side says. But whatever you call them, there are these productivity targets that must be met. And all of the members across the five different jobs that made up this class had productivity goals applied to them. And so the district court said, well, because these productivity goals apply across the board, we have a similarly situated group. Well, the error there is that there's no analysis as to whether rehab synergies either knew or should have known that these plaintiffs were actually working off the clock. So hypothetically, if an employer had a policy that made it virtually a mathematical certainty that there would be off-the-clock work, or at least overtime work, that the employer could then check to see whether there was overtime reported, would that be enough? I suppose it could be. We'd have to look at it, you know, case by case and what the actual facts are. But I think that the analysis would have to be... But the only question here, then, is whether the mathematical certainty has been achieved based on those specific facts. I think so. I think that's fair on the first step. But when you look at the district court's analysis, there's no discussion of, you know, that the employer must have known because these productivity goals were so high, for example. All that it says is... So I've never been a therapist, but I have been in a law firm. And the notion that 90% of the time spent has to be on billable, client-chargeable work, that guarantees... I mean, there's no way that administrative tasks take only 10%. So 90%, to me, in a law firm context, would be a mathematical certainty. Any reaction to that? I agree with you in the law firm context. I have plenty of experience there. But it's different in the therapist context. And the difference is, you know, they vary job to job, they vary location to location. But at a high level, to answer your question, I think that the explanation is, and there's testimony to this in the record from several of the company employees, that unlike in a law firm, there are ways in which therapists can double their productivity, triple their productivity. So for any... Stuff that would be arguably deeply unethical in a law firm context. Absolutely. It's really commonplace to... I think that's fair. Yes. I don't know of any way in a law firm context where one hour could be billed as two, but that's not the case in the therapist context. Doesn't mean it's not done. Fair enough. But there's definitely ways, and this is in the record, that therapists can bill, you know, double, triple time. And for a single hour, depending on whether they layer modalities, whether they're doing group treatment. And, you know, to be fair, some of the therapists testified that they either couldn't do those kinds of things or didn't do those kinds of things, either because they thought they were inappropriate or they didn't match up well with the particular patients that they were attending to. But that just goes to the point that these folks were not similarly situated. For some of these folks, layering modalities and group treatment and concurrent therapy and point of service documentation could have been done and was done easily. For others, not. Is it your contention that the district court judge did not address the employer knowledge issue at all? Wasn't it addressed in the motion to decertify, or did I misread that? So my assertion is that the district court did not address it as thoroughly as it should have. So there is a citation to swales. The district court does say that it's applying swales. But then the analysis just goes to the productivity goals. But again, that's just the first step. So even if we assume that the district court did look at whether the employers had actual or constructive knowledge here, then we still have to look at whether these folks are actually similarly situated, which means that the analysis needs to look at whether the merits question of actual or constructive knowledge can be determined collectively. And I think that the district court erred there, too. And so even if we assume that the district court looked at the right legal principles to begin with, even though I don't think that it did, but if it did, then we have to look at, well, did the district court correctly determine that these therapists across the five jobs were similarly situated? And there again, what you see from the district court is a discussion of the productivity targets, that they all have these same targets, and therefore they are similarly situated. And when we raised three different times that these issues of the size of the facility, or the job that these folks are in, or the availability of different modalities that can allow you to multiply your productivity time, the availability of computers that allow you to do point of service documentation, the availability of students, because students can help you double your productivity also, because they can do the non-billable work while you're doing the billable work, or vice versa. Or the availability of rehab technicians who can go get the patients, which is non-billable time, while the therapists are actually doing the billable time. But in order to assess that, you would have to look case by case. And so to answer Your Honor's question, I think even if the district court did assess correctly what the legal merits were, the district court did not properly assess ultimately whether these folks were similarly situated, because it said, quote unquote, that all those considerations that I just listed were not material, because what was material was the existence of these productivity goals. And so I think that... Would you agree that whether we're at a class action or a collective action context, from the defendant's standpoint, the typical concern is the imposition of mass collective liability without the opportunity for individualized cross-examination? I think that's certainly one consideration. That's what's peculiar about this case, right, is that you all did have the opportunity. This basically looks like an individual proceeding, and I realize it's dressed as a collective proceeding, but what's the harm to the defendant? I'm not suggesting harmless error, Doctor. I'm just wondering, you had all the individualized opportunity for trial. Why is there a problem here? So I think a few issues come to mind. The first is, if we're starting from the assumption that even though the district court called this a collective, really it was treated as a non-collective, you know... Well, the way I put it, it was collective without question. There was opt-in procedures and all that, but your client's rights were protected in as robust a manner as you will ever see in a collective action proceeding or a class action proceeding. You got to cross-examine every individual, so why is there a problem here? That's fair, but I think that assuming that position, that all of these folks testified individually, the existence of all of these individuals testifying... And individual findings. Absolutely, demonstrates that this was a cacophony of individual actions, which is exactly what Soyle is warned against. And so I don't think that we can have, you know... So this goes to potentially a mootness argument that... But what if this is simply, and pardon my ignorance of FLSA procedures, but what if this is simply a joinder of 22 plaintiffs? I think that might be a cacophony, but nobody would say that that was... Absolutely. ...you know, worthy of new trial. Absolutely. And there are cases where FLSA collectives, or collectives, kind of in air quotes, don't proceed under the FLSA collective procedure, but go under joinder. And perhaps that could have happened here, but then you've got to look at whether each of these plaintiffs' claims arise out of the same transaction or occurrence, which is what Rule 20 requires. And so potentially, that would have been an option here, but that's not what the district court did. The district court said that these folks are similarly situated under the FLSA. And so what it does is an end around the joinder requirements. And so if we're, you know, if we assume... Maybe, but end around with what... I guess it is essentially a sort of what's the harm type question, but what would you guys get that you did not get in the trial court if we were to hypothetically grant relief? Well, the procedures would have been vastly different. And so, you know, if this were not a collective action, these folks would not have all been there in the courtroom being able to hear each other's testimony and testify together. Are you saying that this, had they moved for joinder, that that would have been denied and should have been denied? Yes, I think so. We don't know because that never happened, but I don't think that, you know, therapists who are working across 20 different locations in different jobs for different folks would be able to satisfy the same transaction or occurrence requirement. But it was never raised. You know, if it were, then, you know, that's something that the district court certainly could have considered. And so, you know, maybe, you know, I think that part of the problem to answer your harm question is that there's a difference perhaps between representational evidence and collective evidence. And here you had the collective evidence that you would not have had if this were an individual trial. So if you just have one plaintiff, you wouldn't have the collective of all of the other plaintiffs being able to testify and the jury hearing all of the evidence of all of the plaintiffs. And you wouldn't hear, you know, 33 witnesses if this were a single plaintiff case. And so I think that there is a procedural harm here that's unavoidable if you treat this as a collective. But what collective evidence was presented that should not have been presented in one of these individualized trials? Well, I think, you know, we have testimony of 22 plaintiffs. And so all of that... You're saying just hearing another plaintiff was attaining... That's certainly one, yeah, certainly one problem. Anything else? I think on the defense side, you have the same issue, procedurally at least, that, you know, because it's a collective action, the defense is forced to kind of weigh its options and trial strategy is very different. You know, the defense has to decide, you know, do we risk, you know, pushing this trial on for weeks and weeks by calling, you know, director after director after director and potentially, you know, making the jury upset or making the judge upset because this is dragging on too long or it seems like it's too repetitive because these folks are saying the same thing, they're just saying it about different plaintiffs. And so, you know, you're unavoidably forced into deciding, you know, what to do in that kind of a situation where that's not a problem if you have an individual trial. If it's repetitive, that's somewhat of an admission, isn't it? Well, not repetitive in the sense that all of the facts are the same, but if you have one, you know, situation with one plaintiff who's saying, I worked off the clock in ways X, Y, and Z, and another plaintiff who's saying, I worked off the clock in ways A, B, and C, you're going to have to bring in two directors at least, one that's going to testify to the case. The repetitive part, I mean, is that both of the directors may just say, we didn't know. This wasn't a six-month trial. I think it was a six-day trial, right? Yes, but that goes to my point that the defense had— You're concerned that the jury's going to be angry and bored and all that. Yes, that the defense— Six days is not unusually taxing on a jury. Absolutely. And the defense had to make the call of, are we going to make this unusually taxing by trying to call all of the defense witnesses that we would need to call to address individually all of the claims of these collective plaintiffs? And so I think that there is a procedural harm. I see that my time is just about up, so I will reserve the rest for rebuttal. Thank you. Thank you. Mr. Martin? Good morning, Your Honor. May it please the Court, I'm Jerry Martin on behalf of the plaintiffs. The elephant in the room, Your Honors, is that the reason that this trial proceeded on an individual basis is because of the defendants, was at the defendants' request. They filed a motion in limine, attempting to thwart, and they were successful, plaintiffs' ability to proceed on a collective or representative basis. They filed, and the record is at 3878, defendants' motion in limine to permit individual liability determinations. Individual liability determinations, 22 individual liability determinations, were the result of the defendants' motion to exclude and prohibit plaintiffs from proceeding on representative proof. We were prepared to proceed. We presented the Court with a plan, which was to call a smaller pool of plaintiffs and to use an expert that would then extrapolate and present our damages through that method. The Court agreed with the defendants and ordered the plaintiffs to inform the Court two months prior to trial which plaintiffs intended to appear at trial. So the reason, the reason that we had 22 mini-trials, according to the defendant, is because that's the relief the defendant sought successfully. And it was... Why was that cut against them? I mean, I assume what they would argue is the district court should have decertified, and this was sort of a weirdly inconsistent set of rulings by the district court. Why doesn't that prove that it should have been decertified? Well, it, it, it, it, it, why does it prove why it should... Why doesn't the fact that the district court granted their motion, you're saying it's their motion, it's their fault, but why doesn't that prove that the district court should have gone all the way and decertified? I, I, I think that the reason is it shouldn't have been decertified because I think the reason is that they were in fact similarly situated. You, you ask if, you know, what is it that the defendant knew, and, you know, this, what, what they knew at the, what the defendant was established to have known at the certification phase was that countless individuals in their own data were, were, had 100 percent plus productivity, which their own chief operating officer testified was something that should be looked into and should be abnormal, but it happened hundreds if not thousands of times. The proof at trial, Your Honor, proved that the productivity standards caused all of those 22 individuals to work off the clock because the productivity standard, yes, they were different job titles at different locations, and some people worked off the clock in different manners, but the productivity, we're not challenging the defendant's right to have a productivity requirement. We're not challenging the 90 percent per se. What we're challenging and what we challenged and what the district court relied upon is evidence that the individual therapist worked off the clock because of the challenge to meet 90 percent, 90 percent in this context, and, and, but that was the same for, it was true for occupational therapists, physical therapists, speech and language therapists. The way the productivity worked was billable time is productive time, and billable time for every discipline, for every type of therapist, for every plaintiff is time spent hands-on providing with the patient. If they're not with the patient, it's not billable time. So a 90 percent productivity requirement means that in every hour on the clock, 54 minutes must be spent with the patient and six minutes are left to do nonproductive things. And all of these plaintiffs testified that they struggled to meet that 90 percent requirement, that policy of the company that all facilities should maintain a 90 percent requirement. They all testified, now it's true, they did, they met the requirement in different ways, but they testified in very similar respects in that they could not be 90 percent productive, they could not finish their documentation, they couldn't stop and meet with patients, they had weekly meetings just as groups that would count against their productivity, and that they could not meet that productivity requirement because the definition of productivity was applicable across the board. There was also significant evidence at the certification, decertification, and trial that the company was well aware that this was a problem. First off, that came from the testimony of the 22 individuals who testified. Some said that, you know, my supervisor told me to take my laptop home to finish my work. Some testified that they directly told their supervisors, I cannot do this without working off the clock. There was plenty of evidence that established that the company knew about it, and in fact, in 2017, months before we filed our case, the company issued a memo. Now, none of the supervisors that testified had ever seen this memo, but the memo, which is in the record, was Plaintiff's Exhibit 31, referenced the fact that they knew they had a problem of people working off the clock. None of the supervisors that testified knew that. One final point that I want to make in terms of, to go back to this question of, you know, they got the relief that they wanted in the sense that they were able to limit who could participate in the case by being present and testifying and being subject to cross-examination. They also say in their briefing, and they make much of the fact that in their briefing, they didn't get the benefit or that counsel, that me in closing argument, argued that the jury should take note of particular supervisors who did not testify, right, and that that was unfair, and they seem to want to have it both ways. They want to say, you plaintiff must put direct testimony on for individualized testimony, improve your liability and damages on an individual basis, but we get to come to trial and we get to defend our case on a representative basis. But the truth of what actually happened is they only, when they came to trial, or before trial, they provided their witness list, and there were individuals on the witness list that they hadn't identified in discovery. As a result, the judge struck those witnesses. That's not before the court, whether that was a proper evidentiary ruling. They never moved to reconsider and they didn't raise that in their briefing. So essentially I think it exposes that they are attempting to try to have it both ways. The issue as to how many DORs they actually had present at trial had more to do with the failure to disclose in discovery than a trial strategy issue as to how long the trial was going to be. Absolutely. Absolutely. The reason that they did not call supervisors for each plaintiff was not because, as far as I can tell, it wasn't because of some trial strategy not to bore the jury or to drag it on excessively. It was because they were prohibited under a motion in limine ruling by the court that they never challenged. And it was just a very basic fundamental failure to supplement the initial disclosures or to fully respond to interrogatories where we asked for the identification of anyone who had knowledge of the case. That's why they didn't call the witnesses. You're familiar in the class action context. You're familiar with the requirement of commonality, the common question of law or fact. And then the separate question of, and I forget the net, 32B or 32C, the predominantly common. What is the appropriate standard in the collective action context? Do you have to prove the existence of common question or do you have to prove the predominance? Well, I would say— You know what I'm saying? I believe so. I don't have any disagreement with how the courts articulated it in Swales. I think we meet the—our decision, our certification decision predated Swales, but we think the district court followed the same guidance that the court issued later and then, of course, had the ability to analyze Swales and the decertification. And the question in Swales is, you know, really it's a pre-notice decision in a collective action. The question is, are they similar enough to receive notice? And I think here we meet that. I'm not sure that I know the answer to your question, Your Honor, but here you have therapists who had a productivity requirement that is admittedly across the board at 90% for all of the facilities, and that productivity requirement is measured for each therapist exactly the same. It's just a mathematical equation. It is billable time divided by recorded time. And so I think under those circumstances, and I think the court got it right for reasons I've already articulated, in that not only did they have this policy, but they also were aware or should have been aware that they had a problem. Another point, you know, that came out during the certification phase that I haven't referenced is that, and came out in trial, was that they did zero to investigate the claims after the case was filed. The compliance officer was a 30B6 witness, and she testified that after the case was filed down in McAllen, Texas, by Plaintiff Valerie Loy and joined by four others, nothing was done to determine if there was any merit to the allegations, and I think the jury probably read into that, especially in light of the fact that it was a memo just a few months before that the company was well aware that it had this problem and that people were, in fact, working off the clock. I'd like to just quickly turn to and address counsel's arguments about the fact that there were many ways to meet productivity, and those arguments, first, I will start with just this idea, one, and this is probably going down a rabbit hole, but he indicated that group therapy was one way you could see multiple patients. That's not an issue in this case because the record's clear. Rehab Synergies did not allow its therapist, during the relevant time period of the damages and liability phase, did not allow its therapist to do group therapy. That's undisputed fact in this case. When the billing rules changed and group therapy was allowed, there was one plaintiff who did exceed 100 percent, but he was a current employee, and they were looking at the time period after the rules changed. So group therapy was not the way in order to be able to meet your productivity. Also, layering of modalities, the jury considered that. The jury had a lot of evidence in front of it as to whether or not this productivity requirement was reasonable and could be met. In the testimony, first off, these are licensed therapists, and I believe all of them testified that they were authorized, and the company agreed to make decisions as to what's appropriate in terms of providing that care, and if they didn't think doing multiple tasks at once was appropriate, the defendant's witnesses said no, they could layer modalities, and the example at trial was one of the regional managers testified at trial that a therapist could put a patient on a bicycle, an exercise bicycle. These are generally people who are Medicare eligible, who have suffered a stroke or a joint replacement and are receiving therapy inside a hospital as a resident of the hospital. She testified that one way to layer modalities was to put that patient on a bicycle, and then the therapist could also do documentation with a laptop while the patient was on the bicycle and could meet with his or her supervisor and discuss some other matter while the patient was on the bicycle, while they were documenting, and while they were having a meeting, all those three things. The jury, I would submit, didn't find that credible, that there was this ability to meet these productivity requirements through layering modalities. But the fact remains, they asked for us, for the plaintiffs, to deny the plaintiffs the ability to proceed on a collective basis based on representative proof, and they said, You must proceed. Our due process rights require there to be an individualized determination. And they were very successful throughout the course of this litigation, which was their prerogative, to chisel this case down. We started with Plaintiff Loy joined by four other opt-ins prior to certification, and then notice goes out and 45 people join. They served 50 sets of interrogatories and 50 sets of requests for production. So they treated this case like an individualized case. We did not object. We answered all those that we could. The people that were not responsive were dismissed out. So that left us with somewhere in the mid-30s. Their next step was to say to the court, The plaintiffs cannot travel on representative proof. Our due process rights demand a trial with individualized determination, and we have to have an individualized verdict. And they got what they wanted. They got a verdict form where each person had, the jury had to make a determination as to each 22. But the number dropped from 38 to 22 because the court knew and ordered us to go back to our clients and see who was willing to travel to McAllen. There were only five plaintiffs from McAllen. The other 17 had to travel from all across Texas, and some had moved out of state. So we had people that I think 15 people flew to McAllen for trial. So they got what they wanted, and then, yes, they did not call some supervisors as it related to all 22 individuals, but that's because they failed in their discovery obligations, not because of any inability to be able to defend the case on a representative basis. You know, at the end of the day, Your Honors, Swales, the sort of takeaway language for me in Swales is the sentence, the bottom line is that the district court has broad litigation management discretion here, and this case was managed well. This case was managed very well. We had individuals with the same claim that they had a productivity requirement that they couldn't meet without working off the clock, and the productivity requirement was a formulaic requirement that applied equally to every therapist in the case, right? And the court issued notice on that basis and had plenty of evidence that not only was this happening, but had records in front of the court where there were thousands of entries of 100% plus productivity at a time when the company was not allowing group therapy. The court had plenty of reason to determine that these plaintiffs were similarly situated. At the end of the day, 45 people joined. Each plaintiff was subjected to individualized discovery. There were no limits on how many of the plaintiffs could be deposed. We never reached an agreement. We never had that fight. There just were no limits. The defendants were free to take as many depositions as they wanted. They certainly served individualized discovery, and if you didn't respond, your case was dismissed. Then they said, oh, motion in limine, you must, our due process rights demand individualized findings. And as a result, fewer people participated. They got exactly what they wanted. We had a six-day trial. It moved efficiently. The case was very well managed. And at the end of the day, they're here asking for unprecedented and, quite frankly, extreme relief. It's never happened before. There are no decisions where a FLSA case went to trial and court has overturned the verdict based on the fact that the case should never have been certified before. That's never happened. And so what happens next? So now we go back. I mean, aren't there Seventh Amendment implications? I mean, we have a jury verdict with specific findings. Is Ms. Loy, does she have to go? She was an individual plaintiff. Does she have to try her case again? Did the argument apply also to post-verdict decertification of class actions? Would that argument apply to the amendment objection that you're launching? Well, I think the difference here is that all 22 people that I represent actually went to trial and had individualized determinations. It might not. I don't know that it would apply if people received some benefit from a representative ruling. So an absent person who wasn't at court and didn't testify and wasn't subjected to cross-examination. But that's not what happened here. So at the end of the day, I mean, are the four individuals who joined the case prior to certification who are from McAllen, does their verdict stand? Are we going to go and retry 22 more cases? It seems like a terrible waste of judicial resources to have to retry these cases when the defendants got exactly what they asked for. They said no representative proof. Our expert was stricken. We weren't able to rely on our expert. We were not allowed to parse it down and just call a handful of plaintiffs. And they got exactly what they wanted. They cross-examined them, and they had every right to call any witness that they had properly disclosed in discovery. There's no harm to the defendant. They got what they asked for, and they don't like the result. Thank you. Thank you, Mr. Martin. Mr. Martin's son, you reserve five minutes. Do you want to address the group therapy policy issue? Yes. I have no reason to disagree with what Mr. Martin said as far as I know that that's accurate. But remember that group therapy is not the only way to increase productivity. There are several other options there as well. You also agree that under the FLSA you don't need actual knowledge by the employer, that constructive knowledge is enough. Yes, yes. The Fifth Circuit has said that constructive knowledge is enough. Why isn't it enough then to say that you had a policy here that was, if not mathematically guaranteed, at least mathematically likely to lead to significant overtime? Why isn't that enough to put the employer on notice that you're going to have overtime issues? Well, first, I think that the authority says that you've got to show actual constructive or actual knowledge or constructive knowledge, but I don't know of any cases that talk about mathematical certainty. But even if that's true, I'll concede that that could be correct. We've still got to determine whether the merits question can be answered collectively. In other words, does that mathematical knowledge apply collectively to all of these folks? And I don't think it does, given the different job circumstances and places that these folks worked. I don't think that in this case. But you know it doesn't have to be identical. No, of course not. Otherwise, you know, just, you know, your policy is 90 percent. Your policy over there is 90.0001. That's not going to be enough. Of course. But the question, the operative question here is can we determine the employer's knowledge on a collective basis here? And so, you know, Mr. Martin talked about how, you know, some witnesses testify that, you know, they were able to layer modalities or do certain things to increase productivity and others couldn't. But that's the point here is that for the employer to know whether it's a mathematical certainty or not, that mathematical certainty depends on the employee's jobs. It depends on their access to different ways of increasing productivity. It depends on the size of the location that they work at. It depends on whether they've got student interns or rehab techs. And so, you know, even the district court, you know, didn't say that just the mere existence of, you know, a productivity target is enough to prove the claim ultimately. And we're not here to, you know, talk about whether the jury had evidence to support this claim or that claim. What we're here to talk about is whether the jury could have done it collectively. And the answer here is no. Now, you can look at one plaintiff who worked one way off the clock, one plaintiff who had a supervisor tell her that she should work off the clock. But you've got another who says that no one ever told her to work off the clock. You've got another who says that they never told anyone they were working off the clock. And others who say that, you know, they did. Some say that, well, the employer just should have known based on the fact that I was working late or working at home. Others say that the employer absolutely did know. You have one of the evidence—pardon my ignorance because I should know this—among the 22 plaintiffs here, any evidence that one or more of them involved a fact pattern where they were strictly told by everybody in the company, do not work off the clock. We want to pay you overtime. Yes, well, everyone was told that— I know there's the written policy, but obviously the whole point of this is there's a written policy and then there's the real policy. Do you have—is there evidence for one or more of these plaintiffs that they had an idiosyncratic or specific supervisor who said, look, the written policy is real. I do not want you to do anything off the book. Yes, if you'll indulge me just a quick second. So Plaintiff McCrary Taylor said that she was never told or was told specifically not to work off the clock. So that's one that I have that comes to mind. And again, to frame the discussion here, the defense did not get exactly what it wanted here. What we had was an improperly certified class that we had to do whatever we could to deal with here. And the district court, in ruling on the motion in limine, should have decertified everything. But instead it tried to make individual trials here in a way that directly contradicts Swales. And with respect to Mr. Martin, I think the bottom line of Swales is that if you have a situation that results in a cacophony of individual actions, you must decertify the collective. And that's what we had here was a cacophony of 22 individual actions. I see that my time is up. Thank you. Case is submitted.